**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BETTY MARTINEZ,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:10-CV-1655-BK** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION

Pursuant to the parties' consent to proceed before the magistrate judge (Doc. 11), this case has been transferred to the undersigned for final ruling. For the reasons discussed herein, the decision of the Commissioner of Social Security (Commissioner) is **REVERSED** and the case is **REMANDED** for further proceedings.

**I.** **BACKGROUND**[1]

**A.** **Procedural History**

Betty Martinez (Plaintiff) seeks judicial review of a final decision by the Commissioner denying her claim for Disability Insurance Benefits (DIB) under the Social Security Act (Act). In October 2006, Plaintiff filed for DIB, claiming that she had been disabled since April 2006. (Tr. at 97-102). Her application was denied initially and on reconsideration, and Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 56-57, 74). She personally appeared and testified at a hearing held in June 2008. (Tr. at 26-53). In August 2008,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 15-25).  In June 2010, the

Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final

decision of the Commissioner.  (Tr. at 1-3, 14).  Plaintiff timely appealed the Commissioner's

decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

B.      **Factual History**

1.      **Age, Education, and Work Experience**

Plaintiff was 52 years old on the date she filed for benefits and 54 years old on the date of

the administrative hearing.  (Tr. at 97).  She has a fourth grade education, but subsequently

earned her general equivalency diploma (GED).   (Tr. at 291, 29-30).  Plaintiff previously worked

as an order clerk, sales clerk, and day care provider.  (Tr. at 174).

2.      **Medical Evidence**

In February 2000, Plaintiff injured her back at work when she slipped and felt a painful

pop in her back.  (Tr. at 279).  An MRI performed in April 2000 revealed that Plaintiff had

lumbar disc disease at L4-5, transitional vertebra with a degenerative disc at L5-S1.  (Tr. at 279-

80).  In August 2000, a discogram and CT scan revealed that both the L3-4 and L4-5 discs had

annular tears, and Plaintiff had narrowing of the spinal canal at the L3-4 level.  (Tr. at 277).  A

May 2005 lumbar spine MRI revealed that Plaintiff had a transitional L5 vertebra, Grade I L4-5

spondylolisthesis (forward slippage of one lower lumbar vertebrae on the vertebra below it) with

bilateral facet hypertrophy (swelling), and lumbar facet syndrome.[2]  (Tr. at 229).  In September

2006, Plaintiff reported that she was working 20 hours a week.  (Tr. at 236).

---

[2]All medical terms have been defined by reference to *Stedman's Medical Dictionary*
(27th ed. 2000), available on Westlaw.

Dr. Jacob Rosenstein treated Plaintiff throughout 2006 and into 2008.  In July 2006, he noted that Plaintiff complained that her back pain was getting worse, and she rated her pain as 5 to 8 out of 10.  (Tr. at 228).  Dr. Rosenstein found Plaintiff tender in the lumbar spine and, while her gait, heel-toe walking, and muscle strength were normal, her spinal range of motion was limited.  (Tr. at 229).  He performed lumbar facet injections on Plaintiff at L3-4, L4-5, and L5-S1 as well as facet rhizotomies (percutaneous radiofrequency lysis of the facet) at those sites.  (Tr. at 240).

At a follow-up appointment in October 2006, Dr. Rosenstein reviewed the results of a myelogram, which showed (1) a grade I L4-5 spondylolisthesis, (2) a ventral defect at L3-4, (3) a rudimentary L5-S1 disc with a transitional L5 vertebra, and (4) slight diminished filling on the right at L4/transitional L5.  A CT scan showed (1) diffuse L3-4 disc protrusion, (2) diffuse disc protrusion with bilateral L4-5 facet hypertrophy, and (3) L4-5 lateral recess stenosis (narrowing) with gas vacuum phenomenon (the appearance of a stripe in an intervertebral disk) in the facets.  (Tr. at 234).  Noting that the injections he had performed had failed to provide lasting relief, Dr. Rosenstein commented that Plaintiff's "extensive conservative therapy" had not relieved her pain and that she was a candidate for L3-4 and L4-5 decompression with interbody fusion surgery.  (Tr. at 234).

In October 2007, Plaintiff reported that she had not taken her pain medicine recently as her pain and spasms had not been bad enough to warrant using the medication, and she wanted to continue with anti-inflammatory drugs.  (Tr. at 549).

In June 2008, Dr. Rosenstein reiterated Plaintiff's prior diagnoses, and he noted that her back and shoulder were tender, and her lumbar spine range of motion was limited.  Her long leg

muscles also were slightly weak. (Tr. at 546). That same month, he filled out a Medical Source Statement indicating that Plaintiff (1) could stand, sit, or walk continuously for one hour before alternating positions or lying down, (2) could stand or sit for only three hours total in an eight-hour workday, (3) would need to rest for 15 minutes twice per day and during her lunch hour due to her pain and fatigue, and (4) could frequently lift five pounds and could lift a maximum of ten pounds occasionally. Dr. Rosenstein noted that Plaintiff's condition had existed with these restrictions since at least September 2006 due to her lumbar radiculopathy and low back pain. (Tr. at 572-74).

Plaintiff also has a history of depression, anxiety, and pain disorder as well as low average intelligence. An intellectual assessment performed in May 2001 indicated that Plaintiff had a full scale IQ of 81, in the low average range. (Tr. at 284-85). Her reading was at the fourth grade level, her spelling at less than a third grade level, and her math was at the sixth grade level. (Tr. at 286).

In March 2002, Plaintiff was evaluated by Dr. Burke G. Delang, who found that she was suffering from both depression and a pain disorder. (Tr. at 288-95). His recommendation was that she continue taking anti-depressant medications, and he also recommended that she obtain psychotherapy. (Tr. at 292-93). In 2005 and 2006, Plaintiff was prescribed the anti-depressants Zoloft (Tr. at 531, 595) and Lexapro (Tr. at 536-44). In November 2005, it was noted by hospital physicians that Plaintiff had a history of anxiety attacks with atypical chest pain in 2002 and 2003, which had resulted in several visits to the emergency room. (Tr. at 314, 346, 459, 604).

In July 2008, Plaintiff was treated at Dallas Metrocare, a county mental health facility, because, as she reported, her "attorney sent me here" following a "disability hearing." (Tr. at

619).  There, she was diagnosed with a major depressive disorder, severe, and a generalized anxiety disorder.  (Tr. at 619).  Her  Global Assessment of Functioning was rated as only 40 at that time.  (Tr. at 613, 615).  Dr. Ikechukwu Ofomata, who was her treating physician at Dallas Metrocare, noted that Plaintiff's depression was chronic in July 2008, which diagnosis he made the same day she started receiving treatment from him.  (Tr. at 584).  Plaintiff reported that she experienced panic attacks, had persistent muscle tension, worried a lot, and slept poorly.  She reported that she had been on several antidepressants since 1998.  (Tr. at 610).  In late July 2008, Plaintiff reported that her depression, irritability, and anxiety had lessened over the prior two weeks, and she continued to take Lexapro.  (Tr. at 610, 614).

### 3.    Hearing Testimony

At the administrative hearing, Plaintiff testified that she had to quit her job as an infant caretaker because she could not lift some of the heavier babies, could not sit with them for longer than one hour, and had difficulty getting up after being seated on the floor.  (Tr. at 32-34).  She stated that she was taking pain medications as prescribed, but they made her sleepy and unfocused.  (Tr. at 36-37).  Plaintiff had not had the recommended surgery on her back because the doctors were waiting for her diabetes to be better controlled.  (Tr. at 34-35).  She testified that she could do laundry, load the dishes into the dishwasher, make beds, cook, and shop.  (Tr. at 40-41).  Plaintiff stated that she was taking prescription medication for depression and panic attacks, and that she was afraid of confined spaces, but would be meeting a psychiatrist the next week for the first time.  (Tr. at 46-47).

The ALJ inquired of a vocational expert (VE) whether a hypothetical person could return to Plaintiff's past relevant work if the individual could (1) sit for six hours, (2) stand and walk for

four to six hours, (3) carry, push, and pull 20 pounds occasionally and 10 pounds frequently, (4) frequently handle, finger, feel and reach, (5) occasionally crawl, squat, stoop or bend, (6) concentrate for extended periods of time, (7) respond appropriately to routine changes in the work environment, and (8) perform detailed tasks. (Tr. at 49). The VE testified that such an individual could not return to Plaintiff's past relevant work, but could work as a cashier II, a trim attacher, and a ticket seller. (Tr. at 50).

On cross-examination, the VE testified that a hypothetical person of the same age, education, and experience as Plaintiff, who could only (1) sit, stand, or walk continuously for an hour, and only for a total of three hours in an eight-hour day, and (2) frequently lift up to five pounds and occasionally lift up to ten pounds, could not perform any of the jobs the VE had listed. (Tr. at 51-52). Plaintiff's attorney concluded the hearing by arguing that Plaintiff's GED did not equate with a high school level education when compared to her intelligence testing. (Tr. at 52-53).

## C.    The ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of degenerative disc disease and diabetes, but those impairments did not meet or equal a Listed impairment. (Tr. at 20). The ALJ found that Plaintiff had the residual functional capacity (RFC) to lift and carry ten pounds frequently and 20 pounds occasionally, stand and walk for four to six hours in an eight-hour work day, sit for six hours, frequently finger, handle and reach, and occasionally stoop, crawl and bend. He also determined that Plaintiff could perform detailed tasks, concentrate for extended periods, and respond appropriately to routine changes in the workplace. (Tr. at 20-21). The ALJ noted Plaintiff's panic attacks, but also observed that she was able to perform a wide

range of daily activities, she had been able to work until April 2006, and her condition had not deteriorated significantly since then.  (Tr. at 21-22).  Next, the ALJ noted that Plaintiff's physical exams in July and October 2006 indicated only moderate limitations, and she had intact motor strength and sensation, as well as symmetrical reflexes.  (Tr. at 22).

With regard to Dr. Rosenstein's December 2006 statement that Plaintiff was unable to work, the ALJ concluded that this statement was not supported by the evidence because Plaintiff had been able to work up until 2006 despite a disc herniation and demonstrated good physical abilities during her October 2006 examination.  (Tr. at 22).  The ALJ stated that his conclusion was further supported by Plaintiff's minimal follow-up care from October 2006 to September 2007 and her statement that she did not need her medication as her pain and spasms were not that bad.  (Tr. at 22).  For similar reasons, the ALJ did not assign significant weight to Dr. Rosenstein's June 2008 assessment of Plaintiff's limitations and found that, at most, the evidence from 2008 indicated that Plaintiff would merely be precluded from carrying more than light weight and standing for more than four to six hours in an eight-hour day.  (Tr. at 23).

The ALJ also determined that Plaintiff's panic attack in October 2007 and minimal mental health symptoms did not impact her ability to concentrate and respond appropriately to change, in particular because she did not require mental health treatment until after the hearing.  (Tr. at 23).  Further, the ALJ found that Plaintiff would not be expected to experience more than minimal limitations for 12 consecutive months based on the infrequent mention of her mental health symptoms in the record.  (Tr. at 23).  In conclusion, the ALJ found that Plaintiff had a high school education and, given her RFC, she could work as a cashier, assembly worker, or toll collector.  (Tr. at 24).  Thus, she was not disabled within the meaning of the Act.  (Tr. at 24-25).

## II. ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The relevant law and regulations governing the determination of disability under the SSI program are identical to those governing the determination of eligibility under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Thus, the Court may rely on decisions in both areas, without distinction, in reviewing an ALJ's decision. *Id. passim.*

#### 2.   **Disability Determination**

The definition of disability under the Social Security Act is the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to 20 C.F.R. § 404.1520(d), if a claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is deemed disabled without consideration of age, education, and work experience.

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.

*Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

**B.    Issues for Review**

*1. Whether the ALJ failed to make any finding as to Plaintiff's mental impairments*

Plaintiff argues that despite her well documented history of anxiety, panic attacks, and depression, the ALJ failed to mention any of her mental impairments, even to find that they were not "severe" impairments. Plaintiff contends that when there is evidence of a mental impairment that prevents a claimant from working, the ALJ must follow the sequential analysis to evaluate the impairment. (Doc. 15 at 10-14).

The government responds that the ALJ fully evaluated and discussed Plaintiff's impairments and concluded that she did not have more than minimal mental health problems. (Doc. 20 at 7-8). Moreover, the government contends, Plaintiff's medical records from 2002 through 2008 do not indicate any functional limitations due to a mental impairment, and Dr. Ofomata's July 9, 2008 evaluation must have been based on Plaintiff's subjective reports because that was the first time he met her. (*Id.* at 9-10).

In reply, Plaintiff argues that the ALJ should have re-contacted Dr. Ofomata for clarification if he found that the doctor's records were inadequate, rather than speculating about the basis for the doctor's July 9, 2008 opinion. (Doc. 21 at 1-3).

The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). The *Stone* standard does not allow for any interference with the claimant's ability to work. *Sweeney v. Astrue*, 2010 WL 6792819 at *5 (N.D. Tex. 2010). Further, to be disabled within the meaning of the Act, an individual must be unable to perform substantial gainful activity due to an impairment which "has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 404.1509.

Contrary to Plaintiff's argument that the ALJ did not mention Plaintiff's mental health problems at all, the ALJ noted that (1) Plaintiff's panic attack in October 2007 and minimal mental health problems did not impact her ability to concentrate and respond appropriately to change, (2) Plaintiff did not require mental health treatment until after the administrative hearing, and (3) based on the only occasional mention of her mental health symptoms in the record, Plaintiff would not be expected to experience more than minimal limitations for 12 consecutive months. (Tr. at 23). The ALJ, thus, implicitly found that Plaintiff's mental health impairment was not severe and would not be expected to last for the required minimum 12-month period. *Stone*, 752 F.2d at 1101, 1104-05; 20 C.F.R. §§ 404.1505(a), 404.1509.

This finding is supported by substantial evidence because, despite a history of anxiety attacks dating back to 2002 and use of different anti-depressants in 2005 and 2006, Plaintiff was able to work until October 2006. (Tr. at 29). There is no evidence in the record to suggest that Plaintiff's mental condition deteriorated significantly after this time. Moreover, Plaintiff did not

seek counseling until July 2008, and only after her "attorney sent [her there]" following her hearing before the ALJ. (Tr. at 619). Accordingly, the ALJ's finding that Plaintiff's mental impairments were not severe is supported by substantial evidence. *Leggett*, 67 F.3d at 564.

    *2. Whether the ALJ erroneously ignored the psychologist's report indicating that Plaintiff had a limited education*

    Plaintiff next argues that the ALJ erred in failing to address the psychological report finding that Plaintiff had a limited education, despite having a GED, based on her elementary school-level reading, spelling, and math scores and low average IQ of 81. (Doc. 15 at 19). Plaintiff notes that a person closely approaching advanced age, such as herself, with a limited education and a history of unskilled work and work with non-transferable skills should be found disabled. *(Id.* at 19-20) (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 201.09, 201.10). Plaintiff maintains that the ALJ's failure to address her psychological report violated section 404.1527(d), which requires that the ALJ evaluate all medical opinion evidence. (*Id.* at 20).

    The government responds that the ALJ properly relied on the VE's testimony in concluding that Plaintiff could still perform work available in the national economy, and sections 201.09 and 201.10 are not applicable because the ALJ did not find that Plaintiff was limited to sedentary work. (Doc. 20 at 13-15).

    Section 404.1527(d) provides that the Commissioner must evaluate every medical opinion he receives. If a claimant is "closely approaching advanced age," has a "limited" education, and her only work experience is either unskilled or involves non-transferable skills, the Grids require a finding of disability if the claimant's RFC is limited to sedentary work. 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 201.09, 201.10. Plaintiff, who was 52 years old

when she filed for DIB, was a person approaching advanced age at that time. *Id.* at § 201.00(g).

However, the table to which she cites only applies if the claimant is limited to sedentary work.

*Id.* In this case, the ALJ found that Plaintiff could perform a restricted range of light work.

Thus, Plaintiff cannot show that, had the ALJ considered the intelligence assessment in her

psychological report, the outcome of her case would have been different. *Mays v. Bowen*, 837

F.2d 1362, 1364 (5th Cir. 1988) (noting that the court will not vacate a Social Security judgment

unless the substantial rights of the party have been affected). Accordingly, reversal on this

ground is not warranted.

    *3. Whether the ALJ failed to properly evaluate Dr. Rosenstein's treating source opinion*

    Finally, Plaintiff argues that the ALJ wrongly rejected Dr. Rosenstein's June 2008

assessment that she was severely limited in her ability to sit and stand because the ALJ did not

apply the proper legal standard, as required by 20 C.F.R. § 404.1527(d). (Doc. 15 at 17-18).

    The government responds that the ALJ properly rejected Dr. Rosenstein's opinion as to

Plaintiff's work restrictions because that opinion was inconsistent with the medical evidence,

which showed that she had only moderate limitations on her ability to work. (Doc. 20 at 11-13).

Plaintiff replies that the ALJ did not follow the proper six-step test in rejecting Dr. Rosenstein's

findings, and the ALJ's findings as to Plaintiff's RFC are not supported by substantial evidence.

(Doc. 21 at 4-8).

    When a treating physician's opinion about the nature and severity of a claimant's

impairment is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence, the Commissioner must

give that opinion controlling weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)

(internal quotations omitted).  Nevertheless, a treating physician's opinion also may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id*. at 455-56.  However, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  *Id*. at 453, 455 (emphasis in original) (noting that the opinion of a specialist generally is accorded greater weight than the opinion of a non-specialist).  Under that section, before the Commissioner declines to give any weight to a treating specialist's opinion, he must consider the following six factors: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.  *Id*. at 455-56.  When an ALJ fails to apply the six-factor test, the matter should be remanded for that analysis.  *Id*. at 456.  The requirement that the ALJ discuss the six factors set forth in *Newton* and section 404.1527(d) applies only to medical opinions, not to conclusory statements that a claimant is disabled.  *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In his opinion, the ALJ did not cite to the six-factor test set forth in section 404.1527(d) in rejecting Dr. Rosenstein's detailed June 2008 Medical Source Statement.  (Tr. at 572-74); *cf. Frank*, 326 F.3d at 620 (noting that doctor's conclusory opinion that the claimant could not work was not a medical opinion that required application of the six-factor *Newton* test).  In this case,

the ALJ did indirectly address two of the *Newton* factors, namely the support for Dr. Rosenstein's opinion in the medical evidence of record and the consistency of Dr. Rosenstein's opinion with the record as a whole. Nevertheless, the ALJ did not mention that Dr. Rosenstein was Plaintiff's treating neurosurgeon, nor did he discuss the length of treatment of Plaintiff by Dr. Rosenstein, the frequency of Dr. Rosenstein's examinations of Plaintiff, the nature and extent of the treatment relationship, or the fact that Dr. Rosenstein specialized in neurosurgery, all of which are required to be addressed under section 404.1527(d). Accordingly, remand is required so that the ALJ can properly consider Dr. Rosenstein's June 2008 opinion as to Plaintiff's physical abilities. *Newton*, 209 F.3d at 456; *see also Yearout v. Astrue*, 2010 WL 4860784, *10 (N.D. Tex. 2010) (Ramirez, M.J.) (reversing and remanding where the ALJ did not apply the six-factor test); *Schriner v. Commissioner*, 2010 WL 2941120, *14 (N.D. Tex. 2010) (Stickney, M.J.) (same); *Inglet v. Astrue*, 2009 WL 2981908, *8 (N.D. Tex. 2009) (Cummings, J.) (same).

### III. CONCLUSION

For the reasons discussed herein, the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

**SO ORDERED** on July 14, 2011.

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE